# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CROWLEY MARITIME CORP.,<br>    9487 Regency Square Blvd.<br>    Jacksonville, FL 32225;<br><br>CROWLEY LOGISTICS, INC.<br>    9487 Regency Square Blvd.<br>    Jacksonville, FL 32225;<br><br>CROWLEY LINER SERVICES, INC.<br>    9487 Regency Square Blvd.<br>    Jacksonville, FL 32225;<br><br>                          Plaintiffs,<br><br>    v.<br><br>CSX TRANSPORTATION, INC.,<br>    500 Water Street<br>    Jacksonville, FL 33202;<br><br>BNSF RAILWAY COMPANY,<br>    2650 Lou Menk Drive<br>    Fort Worth, TX 76131;<br><br>UNION PACIFIC RAILROAD CO.<br>    1400 Douglas Street<br>    Omaha, NE 68179; *and*<br><br>NORFOLK SOUTHERN RAILWAY<br>COMPANY,<br>    Three Commercial Place<br>    Norfolk, VA 23510,<br><br>                          Defendants. | Civil Action No.<br><br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc. (collectively, "Plaintiffs") bring this action for damages under the antitrust laws of the United States against Defendants, and allege as follows:

## NATURE OF THE ACTION

1.     This is an antitrust action alleging that the four largest United States Class I railroads engaged in price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action related to their direct purchases from Defendants of unregulated rail freight transportation services that were assessed a rate-based fuel surcharge between July 1, 2003 until at least December 31, 2008 (the "Conspiracy Period"). As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2.     Defendants BNSF Railway Company, Union Pacific Railroad Company, CSX Transportation, Inc., and Norfolk Southern Railway Company (together, "Defendants") conspired for years to use rail fuel surcharges, which were added to Plaintiffs' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. The rail fuel surcharge ("Rail Fuel Surcharge") is a separately identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Through their collective action, however, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' fuel costs, and thereby collected billions of dollars of additional profits for a period of more than five years, including from Plaintiffs.

3.     The Defendants—which together controlled about 90% of rail freight traffic in the United States—began conspiring in 2003 (and continued conspiring for many years thereafter) to impose an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits. As part of this plan, they devised and embarked on a scheme to create, apply, and enforce rate-based fuel surcharges that acted as percentage

multipliers on base rates (and thus, on revenue). This permitted these dominant railroads to achieve their desired, and mutually agreed, result: an effective percentage rate increase that could be broadly applied to rail freight customers.

4.    The Defendants maintained their conspiracy during the Conspiracy Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, application, and enforcement, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

5.    In a ruling in early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic for which Plaintiffs are not suing here, found that the Defendants' Rail Fuel Surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel. The STB expressly stated that it lacks jurisdiction over the private contracts, and other freight traffic exempt from rate regulation, that is the subject of this Complaint. In its ruling, the STB explained that:

> [I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.

> Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661,

January 26, 2007) at 6.

6.      An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the first quarter of 2007 came to over $6 billion.

7.      As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiffs in their business and property. Plaintiffs have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

8.      Plaintiffs seek damages on rail freight shipments made under their private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiffs do not seek damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

9.      Plaintiff Crowley Maritime Corporation is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9487 Regency Square Blvd., Jacksonville, FL 32225.

10.     Plaintiff Crowley Logistics, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9487 Regency Square Blvd., Jacksonville, FL 32225.

11.     Plaintiff Crowley Liner Services, Inc. is a corporation organized under the laws of

the State of Delaware, with its principal place of business at 9487 Regency Square Blvd., Jacksonville, FL 32225.

12.     Plaintiffs are leading logistics and shipping companies, based in Jacksonville, Florida. Founded in 1892 by Thomas Crowley, the grandfather of current chairman and CEO Thomas B. Crowley Jr., Plaintiffs now employees approximately 5,300 people worldwide and provides services using a fleet of more than 300 vessels as one of the largest U.S. flag carriers. Plaintiffs also have significant land-based facilities, including terminals, warehouses, and tank farms.

13.     Plaintiffs are substantial consumers of rail freight services within the United States, transporting material and goods via the Defendant rail carriers.

14.     Plaintiffs directly purchased unregulated rail freight transportation services from Defendants during the Conspiracy Period. During the Conspiracy Period, one or more of the Defendants assessed Rail Fuel Surcharges on Plaintiffs in connection with that unregulated rail freight transportation. The prices Plaintiffs paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Plaintiffs would have paid absent the conspiracy alleged herein. Plaintiffs haves therefore been injured in their business and property by reason of Defendants' antitrust violations.

15.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States, including rail lines within this district, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

16.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports between New York, New York, and Jacksonville, Florida and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Van Dorn St., in Alexandria, Virginia, and maintains a government relations office at One Constitution Avenue NE, Suite 300, Washington, DC 20002.

17.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF originates and terminates traffic within this district by providing rail transportation in interchange service with CSX and NS. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

18.     Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including Washington, D.C.). UP maintains an office at 700 13th Street, N.W., Suite 350, Washington, D.C. 20005.

## JURISDICTION AND VENUE

19.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorney fees and costs from Defendants for the injuries

sustained by Plaintiffs by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

20.    Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

21.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391, because during the Conspiracy Period one or more of the Defendants resided, transacted business, were found, or had agents in this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this district.

22.    Venue is also proper because substantially related actions, with common questions of fact, have been transferred to this district by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

23.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this district; (b) directly or indirectly sold and delivered rail transportation services in this district; (c) has substantial aggregate contacts with this district; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this district.

**INTERSTATE TRADE AND COMMERCE**

24.    During the Conspiracy Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The Association of American Railroads ("AAR") Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

25.    The activities of Defendants were within the flow of, and substantially affected

interstate commerce. During the Conspiracy Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant used instrumentalities of interstate commerce to sell and market rail freight transportation services.

26.     The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

### DEREGULATION OF THE RAILROAD INDUSTRY

27.     Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

28.     Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

29.     Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency—like the previously-existing ICC—to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

30.     Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian

entities).[1] The railroad industry is now highly concentrated: Four of these railroads—Defendants BNSF, UP, CSX and NS—operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (*i.e.*, the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require significant regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

31.     Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite occurred—railroads collectively charged shippers supracompetitive prices.

### BEFORE CONSPIRING, THE DEFENDANTS WERE UNABLE TO SUCCESSFULLY MAINTAIN FUEL SURCHARGES

32.     By the early 2000s, the industry had consolidated to the point where further mergers were unlikely, if not impossible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At the same time, railroads were experiencing surging freight demand and tight capacity.

33.     In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only

---

[1] A Class I railroad is defined as having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Railway Company; (6) Soo Line Railroad Co.; and (7) Grand Trunk Corporation. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge applied to as many customers as possible. Under the guise of rising fuel prices, Defendants colluded to create, implement, enforce, and apply widely the Rail Fuel Surcharges as a means to implement what effectively operated as across-the-board rate increases.

34.     Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included cost escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII"), which was published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF"), which is based on the AII) weighted a number of cost factors—labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses—so that the actual impact of particular cost increases (*e.g.*, for fuel) would be reflected in the index. Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF. James R. Young, the President of UP, acknowledged during an October 2004 earnings call that the RCAF "looks at actual costs through the industry."

35.     In 2003, the Defendants seized upon fuel as the means to create the type of across-the-board rate increase for which these railroads, in the era of deregulation, could no longer apply to a regulatory body. The Defendants embarked upon and implemented an agreed plan to remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit separate "fuel surcharges" to be widely applied. With fuel no longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a given percentage—and that is precisely what these four railroads proceeded to do.

36.     Prior to 2003, at least some of the Defendants inserted so-called "fuel surcharges" into contracts for private rail freight transportation, but these fuel surcharges were applied only in isolated instances at very low levels, and each of the Defendants had different fuel surcharge rates, reflecting, *inter alia*, the differing fuel costs of each railroad. Those fuel surcharges "were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) ("*Rail Freight I*"). In short, these fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the" Conspiracy Period. *Rail Freight I* at 48.

37.     For example, NS manager of pricing systems Pat Glennon acknowledged in 2001 and 2002 that fuel surcharges were only "theoretically billable . . . ." *Id.* In September 2002, Glennon reported to the then-Senior Vice President of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause."

38.     UP's Chief Executive Officer James Young admitted that UP "had fuel [surcharge] programs in many contracts, but because fuel had not been run up, they were never implemented" and agreed that Rail Fuel Surcharges prior to the Conspiracy Period "never reached significant percentage levels." *Rail Freight I* at 48.

39.     UP's Chief Financial Officer Robert Knight explained further that, prior to the Conspiracy Period, UP did not have a company-wide policy on fuel surcharges: "[t]here were some isolated situations where there were surcharges but … no policy position." *Id.*

40.     In an "Enterprise Wide Risk Assessment" from May 2002, BNSF explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a

fuel surcharge in the competitive marketplace . . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 103-04 (D.D.C. 2012) ("*Rail Freight II*").

41.     BNSF's executive vice president and chief marketing officer admitted that its fuel surcharge participation rates in early 2003 were "low." *Rail Freight I* at 48.

42.     CSX's executive vice president of sales and marketing testified that the fuel surcharge revenue prior to 2003 was "relatively low to where it needed to be . . . ." *Id.*

43.     CSX's director of marketing described fuel surcharges as "fairly minimal" prior to the Conspiracy Period. *Id.*

44.     Before the Conspiracy Period, the Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *Rail Freight II* at 103. The Defendants could not maintain fuel surcharges as a revenue generator because of competition among themselves; as one UP executive stated succinctly in 2003, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world." A BNSF internal memorandum lamented: "[A]ny increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104. This caused the Defendants to take matters into their own hands in 2003, when they took a series of coordinated actions to switch to a new system that would eliminate competition and thus allow the widespread deployment and enforcement of Rail Fuel Surcharges as a revenue enhancement mechanism.

## THE DEFENDANTS CONSPIRED TO DEVISE A FUEL SURCHARGE SCHEME AND ILLEGALLY AGREED NOT TO COMPETE

45.     From at least the spring of 2003 and continuing until at least 2008, the top

executives of each of the Defendants met regularly at resorts and conferences to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants met to consider and discuss developments in the railroad industry. The Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2 to April 6, at the Wigwam resort, in Litchfield Park, Arizona.

46.     On March 11, 2003, CSX internally recommended making changes to its fuel surcharge program that would have actually reduced the surcharges applied to base rates. Simultaneously, UP's Chief Marketing Officer Jack Koraleski was recommending escalation of UP's fuel surcharge program to be substantially more aggressive. On March 12, 2003, Koraleski traveled to competitor CSX to discuss "fuel surcharge methodology." Shortly thereafter, CSX's leadership abruptly reversed course, abandoning its recommended fuel surcharge reduction and adopting a program matching UP's escalation.

47.     On March 18, 2003, BNSF and NS senior executives, including John Lanigan and Don Seale, met and discussed "synchroniz[ing]" fuel surcharges.

48.     On March 20, 2003, CSX publicly announced a new, more aggressive fuel surcharge program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "the same approach as the CSXT." On April 4, 2003, UP sent a "concurrence" to competitors that its new fuel surcharge program would "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "This is sweet !!! Just like the CSXT."

49.     On April 1, 2003, BNSF and CSX senior executives (CMOs Mike Giftos and John Lanigan) met to discuss fuel surcharges as well.

50.     Between April 2-6, 2003, NS executive Don Seale met again with BNSF executive John Lanigan to continue their prior discussion on "the fuel surcharge issue" at an NFTA meeting.

51.     Similar to CSX's abandonment of a less aggressive fuel surcharge regime following a meeting with UP in March 2003, BNSF decided against a fuel surcharge scheme that could have been fairer for shippers. Between February and April 2003, BNSF had been considering a mileage-based fuel surcharge, which could have better correlated the resulting fuel surcharges to actual fuel costs than the rate-based fuel surcharges that the Defendants broadly implemented during the conspiracy, but abandoned this approach. Instead, BNSF and UP adopted nearly identical rate-based fuel surcharges. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates."

52.     By July 2003, all four Defendant railroads had agreed to coordinate their rate-based fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed. Under this agreement, BNSF and UP agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index"). BNSF and UP began to charge the exact same fuel surcharges pursuant to this agreement, using the HDF Index. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the Conspiracy Period.

53.     While BNSF and UP had slightly different triggers for the fuel surcharge, with BNSF at $1.25 (beginning with a surcharge of .5%) and UP at $1.35 (beginning with a surcharge of 1.5%), the reality was that the HDF Index was administered in precisely the same way for both

railroads.

54.     When the HDF Index exceeded $1.35 per gallon, BNSF and UP thereafter both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

55.     The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index *average* price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

56.     The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

57.     UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced

a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

58.     Even after having agreed to coordinate their fuel surcharges, however, BNSF and UP still faced the significant barrier to widespread use of fuel surcharges: specifically, the widely used private contracts had cost escalation provisions that already accounted for fuel. The Defendants agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn additional profits.

59.     In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a methodology that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

60.     The four Defendants control and dominate the AAR, and the CEOs of these railroads are all board members of the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

61.     Through meetings and discussions within the AAR board on October 2-3,

December 11-12 and otherwise in 2003, the Defendants agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

62.     Pursuant to their agreements, the Defendants, which dominated the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF)—that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period. The Defendants conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy—a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

63.     Defendant BNSF has admitted that it worked through the AAR to accomplish

this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based fuel surcharges to contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

64.     Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, the two Eastern Railroads, Defendants CSX and NS, suddenly moved into lockstep with fuel surcharges based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in 2003. Specifically, the Eastern Railroads likewise agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price, and was functionally identical to that of the Eastern Railroads, as described further herein.

65.     The Eastern Railroads also coordinated when they would change their fuel surcharge—two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel

surcharge percentage to all bills of lading dated in the month of March. In this way, the Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

66.     NS executive Patrick Glennon, a manager of pricing systems, admitted in 2003 that the new fuel surcharge represented a significant change in practice that was "definitely more aggressive," and "definitely yielded more revenue": "By dropping the base to $23 per barrel, raising the percentage yield and taking it sooner, the change is in fact a blatant general rate increase[.]" *Rail Freight I* at 49. Similarly, CSX internal emails acknowledge that although the new program may "seem[] somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%." *Id.*

67.     The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

68.     Thus, the Defendants began to apply Rail Fuel Surcharges as a separate item on shippers' bills in the form of a percentage multiplier. The Defendants used the Rail Fuel Surcharges as an easy way to increase revenues across the board.

69.     The fuel surcharge programs applied by the Defendants during the Conspiracy Period "were more aggressive and yielded more revenue than earlier programs." *Rail Freight I* at

48. With the AIILF they had put in place, and in furtherance of the conspiracy, the Defendants each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, Defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, for example, if the percentage increase triggered by the applicable fuel index was 15%, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by 15%—even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect). This agreed approach yielded the Defendants billions of dollars of additional profits.

70.     There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" fuel surcharge bore no direct relationship to the Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for years to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the conspiracy period.

71.     The creation and publication of a cost escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to independently institute its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action by BNSF, UP, CSX and NS to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

72.     The actions by the Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the Defendants took these collective actions in order to assess a stand-alone fuel surcharge applied to *revenue* (*i.e.,* the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, the Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, the Defendants planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand—so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

73.     Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but the Defendants' conspiracy—to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel surcharges—extended to their "coal" and "intermodal" business segments (in which freight travels by multiple modes of transportation) as well. Notably, when the Defendants met in groups in 2003 to discuss fuel surcharges, including the March 18, 2003 meeting between BNSF and NS and a June 2003 meeting between UP and CSX, the heads of the respective intermodal business groups (and other personnel with intermodal and coal responsibilities) participated as well.

74.     Defendants hatched a single conspiracy extending to *all* shippers, regardless of traffic type, including Plaintiffs. When Defendants met to conspire, or otherwise communicated, they did not limit their conversations to carload traffic. And once the conspiracy was underway, the Defendants took steps, e.g., to align their coal and intermodal fuel surcharges, including by ad hoc adjustments, and exchange information about fuel surcharge coverage. Just as with carload traffic, in the absence of competition during the Conspiracy Period, Defendants greatly expanded the imposition and enforcement of rate-based coal and intermodal fuel surcharges, with the result of raising rates altogether.

75.     As a result of the Defendants' concerted action, Rail Fuel Surcharges charged to rail shippers (including Plaintiffs) were raised to or maintained at supracompetitive levels during the Conspiracy Period.

## THE DEFENDANTS SUCCESSFULLY IMPLEMENTED THEIR ILLEGAL, ANTICOMPETITIVE FUEL SURCHARGE SCHEME

76.     As detailed above, the Defendants agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). The Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here). With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Conspiracy Period.

77.     The chart below shows that the Rail Fuel Surcharge percentages charged by the

Western Railroads for freight shipments varied before the Conspiracy Period began, but were identical starting in July 2003:

| MONTH | BNSF | UP |
|-------|------|------|
| Jun-02 | 1.0% | 0% |
| Jul-02 | 1.0% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1.0% | 0% |
| Nov-02 | 2.0% | 0% |
| Dec-02 | 2.5% | 0% |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |

| | | |
|---|---|---|
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |

78.    As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Conspiracy Period.

79.    The chart below shows that the Rail Fuel Surcharge percentages charged by Defendants CSX and NS for carload shipments varied before the Conspiracy Period, but were identical starting in March 2004:

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |

| | | |
|---|---|---|
| Feb-04 | 4.0% | 2.0% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

80.     In stark contrast to this uniformity in Rail Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads.

Absent collusion, it is extremely unlikely that the Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that the Defendants moved in uniform lockstep for a period of nearly 38 months indicates that the Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In addition, the advance announcements of each Defendant's Rail Fuel Surcharges was an important implementation and enforcement mechanism for the conspiracy.

81.     Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." ("Following the Competition" *Traffic World*, July 14, 2003). The Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual fuel costs. An independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between the Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and their publicly reported actual fuel costs during the period from 2003 through First Quarter 2007 came to over $6 billion.

82.     BNSF's average cost for diesel fuel in Third Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for Third Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from Third Quarter 2003 to Third Quarter 2004. In contrast, the surcharge charged by BNSF based on the HDF Third Quarter 2003 price was $1.46 per gallon and

$1.83 per gallon in Third Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from Third Quarter 2003 to Third Quarter 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue, not merely to the fuel cost component of that rate.

83.    Another reason why the Defendants' Rail Fuel Surcharges were not a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, the Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

84.    There is no independent business justification to explain the Defendants' behavior. Their uniform pricing of fuel surcharges year after year could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increased fuel costs experienced by the Defendants would have been covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action—*i.e*., decoupling fuel prices from the historical railroad cost indices and agreeing to follow new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

85.     In agreeing to collude on fuel surcharges across business segments, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs could impose a lower surcharge or none at all and thereby increase market share at the expense of competing railroads. Rather than engage in such competitive behavior, the Defendants "uniformly began their negotiations with their standard fuel surcharge program and their objective was to apply their standard fuel surcharge as widely as possible." *Rail Freight I* at 50.

86.     In furtherance of the conspiracy, the Defendants also declined to negotiate discounts on the Rail Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable."

87.     Indeed, each Defendant *mandated* application of rate-based fuel surcharges in furtherance of their agreement.

88.     On April 9, 2003, BNSF issued an internal notification stating, "Effective immediately and urgent per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, BNSF's Chief Economist Samuel Kyei noted "contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed."

89.     Similarly, UP implemented a no-exceptions policy as explained by a sales representative to a customer in December 2003: "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no

choice."

90.     In 2004, Don Seale from NS informed his subordinates, "no deviation from NS's published FSC without [his] prior approval."

91.     In 2006, CSX Vice President of Industrial Products Kyle Hancock established, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT a fuel surcharge."

92.     The widespread application of fuel surcharges differed substantively from the Defendants' practices before the Conspiracy Period, when the Defendants were actively competing for customers and could not maintain fuel surcharges in the face of such competition. After the conspiracy began, "any deviations from [D]efendants' standard fuel surcharge programs were rare." *Rail Freight I* at 50. Each Defendant "enforced strict policies ensuring across-the-board application of these standardized fuel surcharge programs on all of their shippers . . . ." *Id.* In this way, the Defendants could avoid undercutting one another and ensure that each could continue to apply fuel surcharges to its customers and reap their supracompetitive profits.

93.     The Defendants acknowledged "that the new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers." *Rail Freight II* at 104. One NS internal email noted that it seemed like all revenue increases were "coming from fuel surcharges." *Id.* A BNSF internal memorandum stated that CSX and NS "have a 'profit center' with their Fuel Surcharge Programs for the customers that participate[.]" *Id.* at 104-105. Another BNSF document described its own fuel surcharge program as "a revenue maximization program, not protection against fuel prices." *Id.* at 105.

94.     A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over

the last decade," demonstrated in the following chart documenting the significant growth in profits during the Conspiracy Period:



*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

95.     The Defendants quickly realized that implementation of fuel surcharges only worked because all the Defendants participated, as noted in a BNSF Executive Team presentation in 2005, "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall." They policed the conspiracy by exchanging fuel surcharge data with one another, resulting in nearly no shift in market share between them.

96.     The Defendants agreed not to undercut agreed pricing or steal market share by offsetting fuel surcharges or by discounting underlying rates. As demonstrated in the table that follows, the Defendants' market shares remained stable following the 2003 agreements.

| Railroad Market Share: Originated Tons and Carloads 2003 - 2006 [1] | | | | |
|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** |

| | | | | |
|---|---|---|---|---|
| **BNSF** | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 |
| Percent of Total Originated Carloads | 28.4% | 29.2% | 30.2% | 31.2% |
| | | | | |
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 |
| Percent of Total Originated Tons | 27.8% | 28.3% | 28.7% | 30.1% |
| | | | | |
| | | | | |
| **CSXT** | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 |
| Percent of Total Originated Carloads | 24.0% | 23.4% | 22.6% | 22.1% |
| | | | | |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 |
| Percent of Total Originated Tons | 23.7% | 23.6% | 23.6% | 23.1% |
| | | | | |
| | | | | |
| **NS** | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 |
| Percent of Total Originated Carloads | 19.0% | 19.6% | 20.0% | 19.5% |
| | | | | |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 |
| Percent of Total Originated Tons | 18.5% | 18.7% | 18.8% | 18.1% |
| | | | | |
| | | | | |
| **UP** | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 |
| Percent of Total Originated Carloads | 28.6% | 27.8% | 27.2% | 27.2% |
| | | | | |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 |
| Percent of Total Originated Tons | 30.0% | 29.4% | 29.0% | 28.7% |
| | | | | |
| | | | | |
| Total | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 |
| | | | | |
| | | | | |
| AAR Railroad Facts and Analysis of Class I Railroads | | | | |
| | | | | |

97.     According to UP President James Young, by July 2007 approximately "eighty to ninety percent" of UP's business overall had "some kind of fuel surcharge mechanism that gets passed on to the customer."

98.     Because the Defendants started their negotiations during the Conspiracy Period using their standard fuel surcharge formula, any deviations from that standard fuel surcharge application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (i.e., facilities served by only one of the Defendants) – who are nonetheless able to harness competition among railroads for negotiation purposes absent collusion – suffered from the conspiracy. NS's CEO, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," expressly acknowledging that "even where there is only one railroad serving a facility, there are market factors at play." *Rail Freight II* at 100.

### THE STB DECISION

99.     Starting in 2006, the STB, which regulates certain aspects of the railroad industry, began holding hearings and investigating the Defendants' practices relating to fuel surcharges. On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). Thus, the STB found, "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." *Id.* at 6.

100.    The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

101.     Pursuant to their conspiracy, the Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## THE DEFENDANTS REAPED SUPRACOMPETITIVE PROFITS

102.     The Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, the Defendants realized billions of dollars in revenues during the Conspiracy Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge. During the period of the conspiracy (July 2003 to at least June 30, 2007), the Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by the Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

103.     A Senate Commerce Committee report reviewed the Defendants' profits and concluded that "a review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade."

104.     The Defendants themselves also attributed their increased revenue to fuel surcharges. In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly

higher traffic volume."

105.     BNSF recognized rail freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." "Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

106.     In 2006, UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

107.     In 2006, CSX's revenue increased $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

108.     The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

        a.      the Rail Fuel Surcharges charged to Plaintiffs for unregulated rail freight transportation have been fixed or stabilized at supracompetitive levels;

        b.      Plaintiffs have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

        c.      competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

109.     By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs have sustained injury to their business or property. Defendants implemented policies that ensured that their fuel surcharges would be synchronized, rigidly enforced, and applied to as many freight shippers as possible. The injuries sustained by the Plaintiffs are the payment of supracompetitive prices for Rail Fuel Surcharges applied to

unregulated rail freight transportation throughout the United States as a result of the Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I
### (Violation of Section 1 and 3 of the Sherman Act and Section 4 of the Clayton Act)

110.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if they were fully set forth herein.

111.    The Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act and Section 4 of the Clayton Act.

112.    The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants in furtherance of which the Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

113.    The Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. The Defendants' unlawful conduct was through mutual understandings or agreements by, between and among the Defendants.

114.    The contract, combination or conspiracy has had the following effects:

a.    prices charged to Plaintiffs for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b.    Plaintiffs have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c.    competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

108.    As a proximate result of Defendants' unlawful conduct, Plaintiffs suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Conspiracy Period.

WHEREFORE, Plaintiffs pray for relief as follows:

(1)    That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2)    That Plaintiffs recover compensatory damages, as provided by law, and that judgment be entered against Defendants on behalf of Plaintiffs;

(3)    That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(4)    That Plaintiffs recover treble damages, as provided by law;

(5)    That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law; and

(6)    For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial as to all issues triable by a jury.


 Dated: May 29, 2020                                By: _/s/ Melinda R. Coolidge___

                                                    Melinda R. Coolidge
                                                    Michael D. Hausfeld
                                                    Brian A. Ratner
                                                    Sathya S. Gosselin
                                                    Theodore F. DiSalvo
                                                    Halli Spraggins
                                                    **HAUSFELD LLP**
                                                    1700 K Street, NW, Suite 650
                                                    Washington, DC 20006
                                                    (202) 540-7200
                                                    mcoolidge@hausfeld.com
                                                    mhausfeld@hausfeld.com
                                                    bratner@hausfeld.com
                                                    sgosselin@hausfeld.com
                                                    tdisalvo@hausfeld.com
                                                    hspraggins@hausfeld.com

                                                    Seth R. Gassman
                                                    **HAUSFELD LLP**
                                                    600 Montgomery Street
                                                    Suite 3200
                                                    San Francisco, CA 94111
                                                    (415) 633-1908
                                                    sgassman@hausfeld.com

                                                    *Attorneys for Crowley Maritime Corp.,*
                                                    *Crowley Logistics, Inc., and Crowley*
                                                    *Liner Services, Inc.*